It's just a matter of U.S. v. the Dukas, Chenoir, and Tartar, and you've divided, I guess, amongst yourselves how you're aligning with it. Given what's come up since we initially set this argument, the initial allotment of time may not make a great deal of sense anymore, but I'll sort itself out. Mr. Brooks, I so appreciate, and I'm sure I'm not speaking for myself, the candor with which you responded to the one issue and recognizing that and bringing that up on your own. It's totally consistent with my image of your professionalism, but it's not something that all attorneys or your office is to be commending for. It's in the best spirit of professionalism and representing the government as its attorney. Mr. Brooks, thank you, Your Honor, and I just want to make sure that all the members of the panel received a letter that I filed on Saturday regarding the mistake in the brief about the FISA evidence. Ms. Brooks, Right. Mr. Brooks, I did, and I did what I did, and actually, I have it in my library. I haven't read it yet, and unless I can get the Internet in here, it won't be read until after the argument, and I don't think I can get the Internet in here, so. It was attached to five photographs, correct? That's correct, Your Honor. That's right. I'd like to just make a housekeeping request if I could, and that is given the number of arguments that we're going to have today, I'd ask that I be allowed to respond to each defense argument after it's completed rather than having the defendants argue one after another and then me respond to all five arguments, and I've spoken to the defense counsel, and they have no objection to that. Okay. It will probably mean I'll have to ride the clock a little more than I usually would. I don't like to cut people off, but I think you're going to have to or are going to be around here celebrating the fireworks on Memorial Day. We'll still be going. Okay. But we'll try to accommodate that. Thank you, Your Honor. Just ask to be brief, and as I'm sure you will, that your rebuttal will really be rebuttaled. Thank you. I'd also like to thank the Court for moving the argument today. I appreciate it. No problem. Counselor Lee? I'm going to be ready. If that's ready, I don't want to see unready. Okay, now you look ready. Yeah, we're ready. Good afternoon, counsel. As it's indicated in our schedule, my name's Mike Riley. I represent Shane Duca, and I'm going to direct my comments to the FISA issue. As the Court knows, I'm not going to belabor some of the history of this, although it's important to discuss. Back in 1978, Congress passed what we know we call FISA, which is the Foreign Intelligence Surveillance Act, and it was created for the sole purpose of intercepting information, exchange between agents of foreign lands, foreign powers that might impact on the security of the United States. A lot of case law that's evolved over time. And the primary purpose test was replaced with a significant purpose test. That's exactly right, and I was going to point that out because that's a significant part of my conversation with you all this afternoon. After the Patriot Act was initiated, the significant purpose test was substituted for the primary purpose test. But still, the focus of FISA was the same, which was gathering intelligence information from agents and foreign countries as it relates to the security of the United States. The process by which this act works is much different from a classic Title III surveillance application or the securing of a search warrant with the normal Fourth Amendment guidelines. We see a situation where the government provides certifications to the FISA Court. Unlike affidavits and supporting information as you would in a traditional search warrant, the information that the government provides is reviewed by the reviewing court, and they issue a warrant under FISA to intercept information which relates directly to intelligence. Now, as we know that there... What kind of intelligence? Foreign intelligence as it relates to the security of the country. And there is a probable cause requirement, is there not? Yes, there is. And there's a requirement for judicial determination before they can take any action. That's exactly right, but there's a difference in the quality of the quantity and the quality of the information that's presented to the FISA judge as opposed to a judge reviewing a search warrant. A judge reviewing a search warrant is going to get information regarding the affidavit, all of his background information, all the facts and circumstances surrounding the request for the search warrant, and these things are going to be provided to the judge who will then rule on that. And significantly, once that warrant is issued, and that issue of that warrant becomes in controversy, there's a Frank's procedure where you can pierce and go behind that warrant and look at the affidavits and determine whether or not they're sufficient and truthful. The Frank's procedure is relatively recent. I'm going to say very recent, but it's certainly relatively recent. Absolutely, but it's a protection of our Fourth Amendment privilege based on the intrusion of the government into our homes or into our conversations. So are you saying that, and maybe this is not a fair question, the fundamental flaw with FISA is the absence of that kind of Frank's procedure? Because the Frank's procedure is something that the courts have done, so it's not in the text of the Fourth Amendment. I still think, if I take that position, I'd be ignoring the purpose of FISA. FISA is purely a process to gather intelligence information, not evidence for criminality. Now, many times, a collateral benefit, if you will, of a FISA application, a FISA warrant, is information generated about criminal activity. And that is the issue that I think we need to address here because that goes right to the issues of the Fourth Amendment. You're asking for us to hold that FISA, this aspect, is unconstitutional on its face, correct? Yes, ma'am. We are not anxious to reach constitutional issues if they can be avoided. Isn't there a harmless error aspect to this, given the very limited nature of the evidence that was – that FISA procured evidence that was actually used here, assuming we now have all of that evidence? That's one of the observations I've seen made over the years, that a particular item of evidence was, in effect, harmless. I don't know – You have two tapes. Yes, ma'am. One asking whether they had the – I forget the name of it, but a certain volume of lectures. Another one having to do with the question of how well you know the informant. Exactly. And then we have some pictures, which are depictions of what we know from the evidence occurred. So I'm just wondering what in this – these relatively small number of bits of evidence compared to – The mass of everything. The mass of evidence. How – Well, that's – What you can point to that says it's harmful as compared to harmless. Well, that's certainly a fair question. And if you're looking at your volume,  how about character of the evidence, what it actually showed in terms of guilt? But the interesting part of that – this was tried on a conspiracy theory. We don't know which of the nails in the coffin were the final nails in the coffin that put certain jurors to a position where they came back with the position that they took. What about the possible paint? Is there a way of ascertaining to what extent – assuming you're right – is there a way of ascertaining to what extent those documents or those tapes led to other evidence? That's hard to say. It's hard to say. Those information – that information went further. Clearly, there was situations regarding Tatar and Schnur and their conversations regarding – The map. The map. And we euphemistically refer to CW1, who was the informant, and the map. And the map may have played a very large part of this in terms of the conviction of Mr. Tatar. That map was a topic of great discussion. It was a topic of videos, a topic of a lot of audio conversations. That conversation may very well have been more significant than what we might look at from Space McCold's record. Let me ask, what about Leon? It seems to me if there's a good faith exception for relying upon a bad warrant, why wouldn't there be a good faith exception for relying upon an unconstitutional statute if it is unconstitutional as amended by the Patriot Act? I think when we're talking about the Fourth Amendment and we're talking about the procedures that are followed, I don't know that that good faith exception would apply. We're talking about a situation where – The good faith amendment was born in the context of the Fourth Amendment. Leon, it's a Fourth Amendment case. And Kroll is also a case that supports that proposition as well. I understand, but still I want to go back to the issues as presented by FISA as it relates to the use of this gathered information with the significant purpose to gather foreign intelligence information and you happen upon criminal evidence. And I think that's the – but if the government pursues in good faith intelligence under the FISA procedure, why isn't that sufficient to satisfy the Fourth Amendment? If they're using it for some other purpose, then perhaps the Fourth Amendment might be implicated. Well, I think that we have to remember what FISA is all about, which is gathering intelligence information from foreign powers as it implicates our security. That's a totally different process as the warrant would be under a Leon situation, good faith exception, as it relates to the execution of a warrant. How is that different? Because preliminarily there are different standards which allow those warrants to be issued. But I think the whole point is a government officer reasonably relies upon something, believing it lawful in both contexts. I just – I don't see the distinction. Isn't that the whole purpose of Leon, saying that the deterrent value of the suppression rule, exclusionary rule, on the map is not served? We have the officer doing what he or she believes it all requires, and that is getting judicial – prior judicial approval, relying upon that approval, executing a search warrant, and getting evidence, only to later find out that the warrant that he or she relied upon is not valid. Again, if that works with a warrant, why wouldn't that work with an act of Congress? I think we have a situation where there's limited opportunity to challenge the warrants. There's limited opportunity to look beyond the warrants. There's limited opportunity with – under FISA and the situation it presents to go beyond that and determine whether or not there actually wasn't good faith. Even if you have a frank hearing – I can't imagine how that would work, but even if you could theoretically have that opportunity under FISA as amended, you would still have the Leon problem, wouldn't you? But you don't know you have a Leon problem in terms of good faith until you look beyond what happened to determine whether or not it was actually a good faith mistake or, in fact, it was something more sinister to it. And I think our inability to get beyond that with FISA-generated warrants and information secured under FISA puts us in a position where the Fourth Amendment analysis wouldn't necessarily fit because we'd always go beyond those affidavits and look at who said what about who and test it in a hearing, in a Frank-style hearing. But with FISA information, you're stuck with it. You can't get beyond that. I mean, that could be – if you were right, that could be judicially remedied the same way the Supreme Court created the remedy in Franks. That's not a creature of statute. And if that remedy were there, wouldn't you still have the problem of Leon? If the remedy was available, but right now there is no remedy to test the efficacy of the information that was submitted in a government officer's certification as opposed to affidavits and supporting documents that you would get in a classic – I thought – I know your light is on, but this is very, very important. I don't want to ride you hurt on the red light, but it's kind of an issue. And obviously, they're all important, but this really goes to the fundamental foundation of the entire prosecution and others likely to follow. And I'm just not sure I follow your argument because I thought you were arguing the problem with FISA was not the absence of a Frank opportunity to get behind the affidavit and test for good faith, but there was a fundamental flaw in the construct itself as amended by the Patriot Act because of what it did to the Fourth Amendment requirement of probable cause determined by a neutral magistrate. Now, you have the neutral magistrate here. You've got a group of them. The problem is the probable cause determination has been supplanted by something else. The probable cause determination in a FISA proceeding and application is probable to determine whether or not it's a sufficient basis to intercept intelligence information. And that goes to primary purpose. Well, actually, now, that's been office. Exactly. But with an inquiry in terms of a warrant, it's whether or not there's probable cause to believe a crime has been committed, and if there's a situation, we can gather evidence as a result of it. There's two different – you're focusing on two different – and the standards, quite frankly – and we have to be honest about this – fact-stripe cases. Some of the cases that are reported are situations where – are extreme. For instance, the Abu Jihad case, where a young man in the Navy transmitted information on the movement of a carrier battle group to the Persian Gulf. And that was a classic situation where FISA intercepts were particularly appropriate, but they were looking to establish there's clearly probable cause to determine whether or not this information was feasible under FISA. And it clearly was because the safety of all of these Navy ships was at risk. Well, that's a matter of degree, though. The argument could be – could be made. I mean, nothing, quote-unquote, happened here, but could have. And who's to say, Monday morning, what was or wasn't something that was a very real threat? I think the distinction urges upon the court is the distinction between probable cause to secure intelligence and probable cause to seek evidence of a crime. And I think the processes are different, the tests are different. The defendant's ability to test the efficacy of supporting documents is different. And the erosion of the Fourth Amendment through – by allowing information, evidence of criminal behavior seized through a FISA warrant, I think is something that Is it only intelligence or is it foreign intelligence? Foreign intelligence. You're basically arguing the Keith distinction and arguing that the Patriot Act basically, even though Keith did not involve FISA, the analysis in Keith is the same, you're arguing. And that given the construct, the reason that the Supreme Court found – I guess that was Title III – to be okay was because of the President's inherent authority to do certain things without a warrant. And as you just said, you can't allow – you can't require a warrant in certain situations for a crime because there may be a legitimate interest in eavesdropping, if you will, absent suspicion of a crime to nationals of a foreign country, sharing information which may not be a crime but the U.S. may want information about that. Exactly. When you move that from the Article 2, Section 1, I guess it is, the President's powers into a situation where you're only looking for criminal activity or primarily looking for criminal activity, the Fourth Amendment has to control, and Keith would suggest, any kind of special circumstance that may arise out of security concerns are not sufficient to override the warrant requirement. That's where you are. Yes, you have no cases to support your view on that. No, sir. Thank you. It's a good question on rebuttal. We've got Mr. Gross responding, so if we allow each attorney to then also reserve rebuttal, we will – not only do we memorial there, we're talking independently at that rate. Your Honor, I don't think any counsel has reserved time for rebuttal. Well, they haven't, but they haven't had a chance to yet. Or maybe they're supposed to notify the clerk, so they did not reserve rebuttal. I spoke with the clerk, and I think I'll count to six. Well, that would simplify things. Okay. Thank you. And we'll let you go over a little bit, because we've got Mr. Riley to go a bit. Thank you, Your Honor. There is no reason – the defendants have presented no good reason for this Court to disagree with every single federal judge who's looked at the constitutionality of FISA. That's an overstatement. My understanding of this is that the only court that has upheld FISA is Abu Jihad. Every – definitely every appellate court has looked at it. Every district court has looked at this, including the FISA Court itself. The trial of the FISA Court has found pretty profound constitutional problems with FISA and struck it down. Your Honor, the In Re Sealed case, which is a case from the FISA Court of Review in a case that we cited in our brief, addressed precisely the same kind of Fourth Amendment challenges that the defendants are raising here. But wasn't that court then boned by the FISA appellate court's decision? That was the FISA appellate court, Your Honor. And that was the FISA Court of Review, and that was the first time that the FISA Court of Review was ever convened. And they had to address a number of issues there going to whether or not the government complied with the requirements of FISA in that case. There's no such challenge here. The defendants did raise a challenge whether there was compliance in the district court. They've abandoned that argument here, and they're relying solely on a facial Fourth Amendment challenge to FISA. And – You said facial. He was the one that said it was applied. They're saying that regardless of what the application was in this case, FISA is unconstitutional because the primary purpose test has been substituted with the significant purpose test. There is two other courts of appeals that have passed on the Fourth Amendment issue since FISA was amended by the U.S. Patriot Act. One is the Seventh Circuit in a brief U.S. versus when, and then there is a case, U.S. versus Damara, which I believe is a Fourth Circuit case. Then there is, of course, the unanimous opinions of the courts of appeals that looked at pre-2001 FISA. They addressed similar challenges to the statute but not taking into account the primary purpose test. Tell us why the Fourth Amendment – there's no Fourth Amendment violation here. Certainly, Your Honor. And, of course, if you have any questions about why this court need not address that issue because of harmless error and the Crow-Leon issue, I'd like to address that as well. But the reason is this, Your Honor. When the government conducts electronic surveillance to obtain information about matters touching on foreign relations and possible attacks by foreign powers, the Fourth Amendment imposes different requirements, and I would submit lesser requirements on electronic surveillance than is required in the traditional law enforcement context. And this court recognized that before FISA was even enacted in the Butenko case. That was an en banc decision by this court. And in the Butenko case, that involved the entirely warrantless eavesdropping in order to obtain foreign intelligence information. And the majority in Butenko said even in that situation, where there was no judicial review, pre-interception review whatsoever, that the Fourth Amendment was not violated. Now, in Butenko… Didn't that turn primary – getting back to this primary purpose – didn't that turn on the President's powers of national security as opposed to having a criminal purpose, which is what we have here? Right. What we have here, Your Honor, is a certification by high-level executive officials that there is a significant purpose to the interception. And what we have under FISA… What is the significant purpose? The significant purpose is the gathering of foreign intelligence information. The government has to certify to that, make those certifications to the FISA court, and the FISA court then has the authority to go behind those certifications and make sure that they are accurate. An In re sealed case, a case by the FISA Court of Review, which binds all the FISA judges, has said that the FISA judge, the first Article III judge – and remember that there's going to be two Article III judges who look at the validity of this interception before it ever gets to the Court of Search warrant that's issued in a criminal case that might only be reviewed by a local magistrate. But in the FISA context, the FISA judge can go beyond the certifications of the executive officials to determine whether or not there is a bona fide, non-criminal purpose to the interceptions, a significant bona fide purpose. And if there is that significant bona fide purpose, I submit that we've gone a very long way to satisfying even the pre-FISA standard established by this court in Botanko. And Botanko was decided – Well, I understand the bona fide purpose, but tell us why that is sufficient to satisfy the Fourth Amendment. Well, there's two aspects, of course, to the Fourth Amendment. There is the warrant requirement and then there's a reasonable requirement. And here, FISA satisfies both of those. As the courts of appeals that have looked at post-Patriot Act FISA have said, and particularly in a sealed case, which I think is the most expansive treatment of this issue, each one of the components of the Fourth Amendment warrant requirement are satisfied. I don't think there's any dispute that an Article III FISA judge is a probable cause component. The probable cause component is that the FISA judge has to make a determination that the interception is going to be made of a foreign power, which can include terrorist organizations, and must also make a determination that the interceptions are going to take place on a telephone facility at which foreign intelligent information, which is defined as – But that's a different probable cause requirement than the norm under the Fourth that a crime is being committed. Here, it's just an association. A probable cause to believe there is an association. Not probable cause to believe a crime is committed. So how do we say that this satisfies probable cause? Because, Your Honor, because Botenko and the United States versus U.S. District Supreme Court opinion say that when you're looking at foreign intelligence information, the information that the executive needs, not necessarily to prosecute criminal defendants, but to conduct foreign relations and to prevent espionage. But isn't that a distinction? Not necessarily associated with a crime. But when it is associated with a crime and criminal activity, isn't it – that's different from Botenko? Your Honor, no, I submit it's different in the sense that Botenko – in Botenko, the government had a certification that its only purpose was to obtain foreign intelligence information. There was no criminal purpose here. And we don't have to – Isn't that difference key here? No, it's not, Your Honor. And it's not for the reason explained by N. Ray Seale's case and adopted by the Second Circuit and Abu Jihad. And the explanation is this. Congress in the Patriot Act went back and looked at FISA and saw how FISA had impeded the government's ability to conduct effective counterterrorism. And the reason was it had caused a wall to exist between the intelligence side – But that wall – the wall was perhaps an overreaction to some judicial decision, perhaps primarily Keith. But you could approach the problem of domestic crime versus – and criminal activity versus foreign intelligence without erecting the kind of walls that were erected. And it's possible that in tearing down those walls, the government went further than the Fourth Amendment would allow, because there's clearly a difference between criminal prosecutions, where the Fourth Amendment clearly applies, even given certain kinds of national security kinds of considerations, as the Court said in Keith, and other kinds of need to listen to what's being said. And that's what happened here, Your Honor. The FISA application and the certifications from – this is a certification that has to be approved by the Attorney General. It has to be approved by people in the national security establishment. And they have to certify that there is a legitimate, bona fide foreign intelligence purpose to the interceptions. Now, what Congress decided was, even if there is also some purpose to gather evidence to thwart a crime, that doesn't mean that the Fourth Amendment should impose the same requirements that it imposes on a purely criminal investigation. And the reason for that is twofold. One is, early on in the investigation, investigators may not know exactly what it is they're going to find. And let me give you a hypothetical. You have a situation – I don't want to say what you're trying to talk about, but it seems to me that the wall, which you referred to, allowed for exactly that kind of consideration. It allowed for the government to obtain evidence based upon its ability to do so under the foreign intelligence need. And when it then looked like this was getting criminal, there was nothing to say that the criminal prosecution could not go forward. It could. It simply, at that point in time, was very clear that certain additional protections were allowed. I'm not sure that I understand the difference that you're alluding to in the other problem is, do you ever have a situation, realistically, where you have one without the other? And that is, it seems to me, you always have a situation where an investigation into the domestic activity in the U.S., some kind of foreign intelligence operation, will always involve criminal activity. So don't you have an exception which erodes the FOIA's amendment? No, no, your honor, because in order to effectively conduct counter-espionage, you need the kind of protections that FISA has erected. The Supreme Court has understood, and the courts of appeals have all understood, that you simply can't have the same kind of So this falls under the special needs line of cases of the Supreme Court? That's certainly what In re Sealed Case said, that this is, because it's not solely for criminal law enforcement, it's like the Fourth Amendment cases, where probable cause is dispensed with altogether. The border... How do you assess reason for this then? You're saying that this is just as reasonable a procedure as the Fourth Amendment requires for criminal prosecutions. Well, your honor, reasonableness is obviously a very broad standard. And here we have congressional findings that the mechanism that they've established under FISA and the safeguards that they've imposed under FISA, dual review by an Article III judge, certification by high-level, by various high-level officials in the executive branch, and review of those certifications. It makes this, first of all, not only do you have a warrant, but makes the entire mechanism reasonable, that there have been safeguards placed in the statutory framework to prevent the government from using FISA to circumvent the requirements of Title III. It would be an easier case if there were no prosecution here. That's right, your honor, but... In some ways, the fact that there's a prosecution, we're looking for probable cause as to criminality, whereas you're arguing that the warrants issuing upon probable cause, we found that foreign intelligence can be its own. Right, but your honor, the Supreme Court has said in various contexts that as long as there is not a violation of the Fourth Amendment, even though, for instance, in the special needs cases, the cases involving administrative searches, where no one's looking for crime... But that's the impracticality of a warrant, real special needs. That's really not this case. But there is an impracticality, your honor. There's a fundamental impracticality in having the Fourth Amendment jurisprudence that applies to criminal investigations imposed on foreign intelligence information gathering. Well, yes, but to the extent that that foreign intelligence investigation is criminal, the Supreme Court rejected that argument in Keith. That was exactly the argument that was made. But your honor, that was domestic intelligence. And in Keith, they said, we are not holding that all the requirements of Title III apply even in an investigation of domestic intelligence. And then went further and said, and of course, there's the whole separate area of foreign intelligence gathering. And that is something where the courts should be even more solicitous of the government's need, fundamental need, to protect the country against dangers imposed by foreign governments or terrorist organizations, very different kind of threat that arises in ordinary criminal investigations. They also talked about, and this is not this kind of a case, but they also talked about the danger and perhaps the need to give more protection to those kinds of cases because of the tension between the First and the Fourth Amendment. Again, this is not that kind of a case. And that's why Mr. Raleigh said it's as applied and not facial. Well, I understand his argument to be a facial challenge. I don't understand. You can ask him. He can tell us what he said as applied. It may not matter. Okay. If I could just briefly turn to the reasons why the court doesn't need to enter this determination. This case, I think the evidence here shows that the FISA evidence could not have had a prejudicial effect on the jury's verdict. Do we know that we have all of it now? Your Honor, I'm quite confident that we have all of it. I'm just thinking of springing up out of the ethers late Friday night and Saturday morning. How can you be sure? Your Honor, it's obviously deeply embarrassing to stand here and admit that there was an incorrect statement in my brief. I hope the court can appreciate in a three-month trial involving many, many thousands of documents that this is something that was inadvertently missed. Well, I guess by virtue of the fact that it wasn't raised by the defense, it's not something as blatant as we might think. Thank you, Your Honor. You were not trial counsel, I assume. Excuse me? I assume you were not trial counsel. I was not trial counsel. But I was involved. I was neck deep in this trial. And any errors that were in my brief or any errors in the indictment, I take responsibility for those. But you've got two short conversations and you've got some photographs which, as Judge Rendell pointed out, were contemporaneous with deeply, deeply incriminating recorded statements. Remember, there's no challenge to the recorded statements where the informants were wearing body wires. That was absolutely the crux of our case. Judge McKee, I think I heard you mention something about the FISA intercepts being important. This case rose and fell on the defendant's statements to the informants, of which there were dozens and dozens. And I'll return to this later with other issues, but the fighting issue in this case is when the defendants were talking about killing American soldiers at Fort Dix and elsewhere, where Mohamed Shnur was saying, I want to put a bullet in the back of their head, where the defendants were talking about blowing up airplanes that were flying out of McGuire Air Force Base. The issue the jury had to decide was, were they serious? Did they mean to attack soldiers or were they just talking to blow off steam? And these conversations that came in under FISA really had very little to do with that. And one other point, and well, if I could just take a moment, Your Honor, there really was very limited use made of these conversations, as you can see that from the government's summation. It really didn't dwell on either of those two conversations. And with respect to Eljabir Duka's statement, where he merely calls up a clerk at a bookstore and orders conference of jihad, we have recorded conversations that are unchallenged in which he Al-Awlaki, who we're still trying to catch, where he says, Al-Awlaki, he gives it to you true and uncut. This is the future of religion. So there can't be any doubt that Eljabir Duka, out of his own mouth, has signed on to the message of confidence on the path to jihad. And that's really the only relevance of that one FISA intercept. And then with respect to conversation between Mr. Schnur and Mr. Tatar, where Mr. Tatar is abrading Mr. Schnur a little bit for talking to the informant, we've got Mr. Tatar on tape saying something so remarkably incriminating. I'm in this conspiracy. I'm doing it in the name of Allah. I'm doing it. I don't care if I get arrested or killed. He's confessed on that videotape to precisely the conversation between him and Mr. Omar, which takes place later. There was a question about taint. We've already got Mr. Tatar on tape saying he's in the conspiracy. So there's no issue of taint here. And then finally, with respect to the good faith exception, the government jumped through all of the FISA hoops in this case before it undertook any surveillance. And that's precisely why suppression is not appropriate. Mr. Raleigh said, well, we couldn't go behind the certifications to conduct a Frank's hearing. That's not the question in Kroll and Leon. The Supreme Court said the point of the exclusionary rule is to deter unlawful police conduct. Here, the investigators went through and did everything they were required to do under this elaborate statute. That can't be an exercise in bad faith, unless the court has any other questions. Just on Leon, I mean, the whole idea, as you said, behind the exclusionary rule and good faith exception is because it is behaviorally related. When it comes to FISA and the constitutionality of the statute as such, is the behavior really relevant? Doesn't it go more basic than that, that if this is an unconstitutional seizure just from the get-go based on the statute? What does good faith have to do with it? It seems to me it's apples and oranges. Your Honor, that's why I sent in the police acted in conformity with the statute and didn't even secure a warrant. The warrant allowed for, I believe, a warrantless seizure in that case. Subsequently, that statute was struck down. The Supreme Court said in Kroll, this really is no different. The good faith exception applies for the same reasons in this context where the police were acting pursuant to a statute as in the case of Leon. Thank you very much. Mr. Ciprone is next on the program, but your issue has been supplanted. So do you want to say something, just to say something, or do you want to waive your time? If you could let your fellow members of the bar know that, that would be appreciated. I just want to make one point about count four. And that is simply with respect to the remand. Of course, the court is now going to have to remand this case with respect to count four. There will be no briefing on count four? Absolutely not. But the only question is, should there be a limited remand? Because normally when a count is vacated, there's a general remand for resentencing. And here, we ask that the case be remanded, that there be a limited remand, only so that the district court can vacate the sentencing conviction and return the special assessment on count four. If your honors do not disturb count one conspiracy, the other conviction on Mr. Schnur, he does not have to be resentenced on count one. You've obviously thought of it a little bit more than we have. I'd prefer you deal with that in supplemental submission regarding count three is exactly what to do on count one. Okay. Certainly. Certainly, your honor. Thank you. Thank you. Mr. Archie? Good afternoon, Mr. Chairman. Thank you. I'm sorry. Before you begin, Mr. Ciperon, you've sent us a rather detailed letter brief over the weekend. I assume that you would still respond with a supplemental briefing. Certainly, your honor. The issue of the nature of the remand was not addressed in my prior submission, so I certainly would respond. Thank you. That's great. That means we get three more submissions by everybody. And there will be a submission on count three. Correct. Mr. Archie, with great trepidation, now you may approach the microphone. Thank you. Good afternoon to the panel, council, government. My name is Troy Archie. I represent Elvira-Duca in this appeal. I'm here on an issue on constructive amendment of an indictment via prosecutorial misconduct. I understand the legal issue, but what is the harm? All the evidence here went really toward Fort Dix, and I guess it was some mention of McGuire and even this courthouse. But the evidence that was introduced and the personal statements, didn't they all go toward Fort Dix and map was Fort Dix? So to the extent that the prosecutor makes a statement in closing argument, the juries are told that you take the law from the judge and not the prosecutor or the defense attorney. What difference does it make? Well, respectfully, I think the government withdrew in those comments pointed out in my brief. They basically said that the defendants didn't actually settle on a target in the United States. Count one of the superseding indictment names numerous targets under the statute, under section title 18, section 1114. It's a conspiracy to kill military while in their official capacity. They can only be in their official capacity if they're actually doing something for the military on a military base at an embassy or something to that effect. By telling the jury that, in fact, they didn't settle on a target, the target's name in the indictment were all in the U.S., United States, and it didn't have to be in the United States. It could be in Iraq or Afghanistan. I think that misconstrues the statute. I know the U.S. government in their response said that they laid out specific targets for venue purposes. I think that's not correct. If you look at the statute, section 1114, title 18, it talks about, again, killing U.S. soldiers in their official capacity. It mentions killing, which is murder. That's section 1111. If you look at it, section 1111, it has jurisdictional limits implicit in the statute. It talks about a special maritime jurisdiction of the United States. It's actually defined in section 7 of title 18. You take a look at section 7 of title 18, it talks about things in the United States. Well, let me ask this. I think this is related to Chief Judge McKee's question. If there was no evidence as to killing or activities in another jurisdiction, that, therefore, would have been beyond the statute, how can there have been a prejudicial amendment, if you will? I think the court has all the evidence in this case, all the transcripts. They talk incessantly about going overseas, joining the Mujahideen, wanting to fight in Iraq or Afghanistan. They did talk about going overseas. But was that to kill American officers overseas? Well, we don't know. I mean, they talked about going to join the Mujahideen. If they did that, I would think that would be to fight U.S. soldiers. The question is, if they go over there, does the United States have jurisdiction if they want to join the Mujahideen or if they want to join the Taliban? I don't think they do have jurisdiction, because if they did, we would have multiple cases here throughout the United States, which we don't. But they're arguing that the statement refers only to where the conspiracy took place. And the indictment does lay out where the conspiracy took place. Wouldn't that be enough to get around the constructive? Well, I think it would. But the fact is, they went back on that in their closing argument. But doesn't, wouldn't else, isn't the most reasonable interpretation of the term elsewhere to mean those military installations that were listed in the indictment that include Fort Dix, but also include McGuire, Lakehurst, Fort Monmouth, Dover Air Force Base, and so forth? Yeah, I would believe that elsewhere does mean that. I think the government is arguing that the elsewhere could mean anywhere else in the world. The statute implicitly says, it says in their official duties, they lay out in paragraph two of the superseding indictment, which you just said, all these different locations, which are in the United States. The government argued that the elsewhere means the United States and anywhere else. I don't think section 117 in the statute and superseding count to section 1114, or section 111, or section seven of title 18 expands to anywhere else, as the government alleges. But in the argument, in the closing argument, it just used the term elsewhere. Is that correct? No, they said any elsewhere, Iraq and Afghanistan. Right. So how, if it's elsewhere in Iraq and Afghanistan, without the jury knowing that it's a specific target in Iraq or Afghanistan, how does it fall within the statute? If it's not explained to the jury, I think that constructively amended the indictment, it broadened the scope of what was pled in count two of the indictment, and the jury really didn't have a roadmap as to actually what they can convict. Because there was no objection at the time. And I understand that there was no objection. I understand it's a good aside bar, given the opportunity. Right. I understand. But I understand it's review under plain error. I believe it is an error that was plain because it did amend the indictment. It broadened the scope of the indictment. But did it really amend the indictment? I mean, we have case law that says if there's a constructive amendment, it really has to be asked to an element of the offense. Here, it would seem this is more a looking at our case of U.S. versus McKee, and I guess U.S. versus Lee, where if it doesn't alter an element of the offense, it should be analyzed as a variance, not a constructive amendment of the indictment. I mean, that's a quotation from our counsel. Well, I believe the way count two was explained, broadening it to overseas does, in fact, expand the indictment, because it actually doesn't give the jury information on how they can reach overseas and convict these men of the conspiracy, if they didn't believe that it took place in the United States, which the government itself said. But it needs to be an amendment of the indictment. We feel that it has to be asked to an element of the offense as compared to... An element of the offense in count two was that they were in their official capacity as U.S. soldiers. That is an element of the offense. They have to prove that's why they said Fort Dix, that's why they said McGuire. But the location is not an element of the offense, is it? Well, I would think that the location actually proves that they would be in their official capacity by working at Fort Dix or Fort Monmouth or in Delaware or in Pennsylvania. Tying into object of the conspiracy. Yes. So, if they're saying it's abroad, how do we know that it was actually at a U.S. embassy or a U.S. military base overseas, if it's not alleged in the indictment? That's where it causes the confusion. Mr. Archie, thank you very much. Thank you. Mr. Archie saved me this time, so I'll be a little more oligarchical. Very brief. This is no more than a variance. In plain air review on a variance, you have to show... Is it a variance? It's not, Your Honor. Why isn't it a variance? Why wouldn't it refer back to those military installations that are listed in the indictment? My first answer to that, Your Honor, is that on plain air review on a claim that the indictment said something that the government claims it doesn't mean, this court in Vitello says that the indictment has to be construed broadly. Although I guess it's possible, as you suggested in your question to Mr. Archie, that elsewhere means Camden, Burlington, Ocean, and Monmouth County, elsewhere means other counties in New Jersey. That's a more narrow reading of the indictment than is permitted on plain air review. Another reasonable interpretation of the indictment is elsewhere means anywhere. If elsewhere means anywhere, which I submit is a reasonable reading of the indictment, then there cannot be a constructive amendment when the government says, in rebuttal summation, that the charge here isn't limited to killing Americans in the United States. Now, Mr. Archie made a couple of arguments that I think are not the same arguments that are in his brief. He talked about the fact that unless we prove that American soldiers are on an American base, we haven't proved up the elements in the statute. That's simply not the case. He would have moved at the conclusion of trial under Rule 29 to say the evidence was sufficient to prove that these men intended to kill Americans on military bases. Of course, it was overwhelming that the focus of this conspiracy was on Americans in military bases. You have Mr. Schnur surveying numerous military bases identified in the indictment. You have him talking about blowing up airplanes coming out of McGuire Air Force Base. You have surveillance of the Coast Guard. That was clearly the focus of the indictment. Now, elsewhere, another complaint they could have had is elsewhere is simply too broad. They could have filed a motion before trial saying we didn't get constitutionally adequate notice about where this crime is taking place. They didn't do that. They might have if they said, well, maybe the indictment is not constitutionally overbroad, but it's difficult for us to defend against that based on a term like elsewhere. What do you do in a situation like that? You file a motion for a bill of particulars. They didn't do that. What they've waited until, and Mr. Archie said, well, you don't interrupt counsel's summation, but you certainly have an opportunity after summations are over to lodge your objection. They didn't raise an objection then. They didn't raise an objection on post-trial motions. They didn't raise an objection until this case was in this court. That cannot be plain error. In addition to the fact that there is no constructive amendment, as Judge Rendell pointed out, because we didn't alter an element. All we did at most was talk about the venue of the conspiratorial agreement. There's no case that holds that you can constructively amend the indictment in a summation, much less a rebuttal summation. This court's case law, the McKee case, Commonwealth v. Sim case that Judge Becker decided, all involved jury instructions that told the jury that they could convict the defendant based on conduct that wasn't charged in the indictment. A very different plain error standard applies to prosecutorial comments, and there's good reason for that. The judge tells the jury, you have to take the law from me, and on appeal, this court presumes that the jury followed the instructions. There's no such binding effect, no such presumptive binding effect of a prosecutor's summation. Agreeing with the defendant in this case means that every time that the government stands up in a rebuttal summation, which is given off the cuff following defense arguments, that the government runs the risk of having the entire conviction thrown out when the defendants don't object and raise a claim of constructive amendment and allow the complaint to be raised for the first time on appeal. No court anywhere has held that. Just briefly, there's no way that these defendants can meet the fourth prong of plain error in this case. The fourth prong is an independent requirement for plain error review. You have to show basically a miscarriage of justice. You have to show that the failure to correct this alleged error would cause unfairness or the public reputation of the courts to suffer. The evidence that the defendants were conspiring to kill soldiers on military installations in New Jersey was overwhelming in this case. So I would submit that they have not met their very, very stringent burden for establishing plain error. They didn't like this remark. They should have stood up and objected and given the district court judge a chance to rule on it. One of the things the district court judge could have done was read the indictment language and tell the jury they're bound by the indictment language in this case. Or the district court judge might have said, I agree that elsewhere only means with respect to these, he could have made a ruling on the indictment on the spot and said elsewhere is limited to New Jersey and the jury would have been so instructed. Same verdicts would have come back in that situation. Thank you, Mr. Good. Thank you. Good afternoon, counsel. My name is Michael Huff. I represented Drayton Dukka or as he's known by his family, Tony Dukka at trial and now on appeal. I'm going to be addressing the videos that were discussed. I don't know how my colleagues feel, but at least from my perspective, when I talk about the case being over-tried, I don't know why those things were admitted. They didn't have to be admitted. But since they were admitted, given the evidence that is there, you can always argue that that so inflamed the jury that they couldn't sit back and evaluate the evidence. This is not really that kind of a case. We're not talking about a case which may be closed and there may be evidence that if the jury gets really inflamed about something, that's going to spill over and impact the ability to deliberate. Is this really that kind of a case given the statements that you have on tape and everything else that's in the case? I think so because as Mr. Gross pointed out, the main crux of the defense's argument in this case was that the defendants never intended to harm anybody, never intended to kill anyone and that their conversations with the informants were never serious conversations. The videos don't negate that. If that's where the defense wanted to go, the fact that you've got these videos and then the description even more gruesome than the videos themselves, I watched all these videos, most of them, in chunks, not the entire thing. They don't really, they're not as graphic as the description would suggest. You have these guys sitting there giving statements and confessing and then the transcript of what happened after the videos cut off is read to the jury. How would that alter that line of defense? They could have still been bluffing or puffing amongst themselves and watch these videos. Well, I'll relate to the all of those weeks and the government may have had different feelings, but I certainly had the feeling that when those videos were played, when those lights were turned out and when that screen came down and those videos were aired and after the jury had a chance to sit through and watch those videos, again, I personally almost had the feeling that the jury kind of shut down at that point and that you almost had the feeling that the case was lost just from the mere fact that defendants were in possession of these videos and that the defendants viewed these videos. I mean, you're saying they were impacted by the fact that the defendants had them and watched them, not by what was going on in the videos. In other words, they weren't derailed from the evidence, which is what real prejudice is about. Prejudice is deciding a case on something other than what the jury should be paying attention to. These are relevant to the motive and the intent of, you know, these are watching them and they're watching all of these and Judge Kugler said it is relevant to motive. I mean, the fact that the jury didn't like it, you know, and used it as part of guilt isn't the test of prejudice. It's a question of the probative value versus the prejudice, i.e. distraction. So by your saying the jury's wondering why they're watching them and the content, to me that really bolsters their relevance. Tell me how the court was wrong in its analysis. I think it is more than just the fact that they possess these videos and view these videos because obviously it is what is on the video that causes the prejudice. They go over and over. Some of them are actually quite, when you get the length and breadth of them, some that are just, you know... Are you contesting the probative? Absolutely. Both the probative value as opposed to the prejudicial impact and I'll talk about the probative value, I'll talk about the prejudicial impact, but everyone has said that the state of mind, the intent of the defendants was a key issue in this case. So why would they not be probative? Well, I think the issue is that... Improving intent. Right. Obviously, you know, there is that balancing test under Rule 403, the probative value versus the prejudicial impact and, you know, the probative value in this case, in a lot of the cases that are cited, there's really generally two types of type of video type evidence. You might have video type evidence that is inflammatory but shows the crime scene as cited in our brief, the Virgin Crime Scene, where the defendants, or at least one of the defendants in that case said he had nothing to do with the murder, but the video of the crime scene itself helped prove, you know, the government's theory as to how the crime took place. So you have one type of video where it's actual crime scene video itself or nowadays you have everybody with a cell phone that has video camera or picture capacity. So unfortunately, there are cases that appear in the media today where actual perpetrators of crimes are videotaping themselves committing the crime as it's happening. So you have that type of relevance and then you have the type of relevance that's in this case where you have videos that obviously the defendants do not appear in, that the defendants are not pictures of the crime scene themselves. They watch them ad nauseam. Well, and again, you know, the arguments at trial, of course, were that one of the reasons that they were watching them ad nauseam was because of the informants in this case were constantly prodding them and asking them, you know, if they could have copies of the videos, if they could watch those videos. That was your jury argument. That was part of our jury argument, yes. So you have that relevance or that very limited relevance to show intent and as your honor indicated, there was other evidence that the government could have used and didn't have to a prejudicial impact that you're going to have on the jury where they're just going to, you know, stop listening to the evidence and just shut down after that. And I think that the nature of these videos, as gruesome as they were, showing defenseless, arguably innocent individuals kneeling on the ground with individuals standing behind them, wearing masks, carrying automatic weapons, you know, sawing the heads off of these individuals. The sawing is not in the video. I'm sorry? That's what I saw. That was redacted. The sawing is not in the video. Well, those parts were, of course, redacted because the court itself, Judge Cougar himself, recognized the gruesome nature of those videos and the prejudicial impact that the defendants could suffer, but, you know. If there had been videos of individuals killing innocent people with machine guns or AK or Kalashnikovs or something like that, would they have been relevant? Well, I'm sure the government would argue that they would be relevant because that's what is or was alleged in the indictment that the defendants intended to kill innocent military. I'm asking you. I would not believe that they would be relevant now. I think they would be more relevant than or arguably more relevant than the videos in this case, which, of course, you know, what we're arguing is the decapitation videos. There's no evidence in this case that the defendants ever intended, you know, to use decapitation as their method of committing the acts, and we still maintain steadfastly that there was no intent to commit any crime in this case and that these videos, especially in light of 9-11, that these videos of innocent people essentially being executed for propaganda purposes, any relevance that that may have had in keeping with the defendant's intent in this case was absolutely substantially outweighed by the prejudicial impact of showing these videos to the jury. There are videos there of people getting, I saw civilians being shot. I'm pretty sure I did. I know there are a number of videos of soldiers being shot, of buildings being blown up. I'm not sure now that I remember seeing any civilians being shot. There may not be any. I don't know. As I said, I brought these in chunks. Well, I do specifically remember there was video of soldiers being killed. Again, I think, you know, while all gruesome, you know, there are, of course, degrees of gruesomeness and that when you're just dealing with an unarmed person, you know, even, I believe, the video of Nick Berg from Westchester, Pennsylvania, may have been one of the videos that was in possession. You have innocent people that are being killed. That kind of prejudicial impact may be slightly less, for instance, than a soldier who's being killed, which is, I guess, somewhat what you would expect in warfare. These were actual civilians being killed, which, again, was so highly prejudicial that the judge himself recognized that person needed to be redacted. And then we had an individual come into court and just describe to the jury what was going on. Well, that's understandable. They appealed to the emotions. Again, I get back to the distracting from the evidence. But if the main argument here is, were they or were they not preparing for jihad in a way that was violent? And they watched. I mean, how many minutes of these videos were there? I don't know the exact time frame. But we're talking a lot. And the fact that they watched, it's not that they were found on a shelf. The ones that were admitted were ones that they watched. So I just think it's difficult to say that they were lacking in relevance. I guess I need to hear your argument again. Well, again, as far as the relevance is concerned, I began by saying there's two types of videos, videos where you actually are showing a crime scene itself, where the government has to say, well, this type of crime was committed in this type of way. And here, look at a picture of the crime scene that is in conformity with our theory of the case. This isn't really a situation where the defendants are charged with decapitating individuals. No, but the fact that they watched them is an operative fact. Is it not in what occurred here? I just think that it's tough to argue. From a prejudice standpoint, you may be right. Well, and that's the whole point. What kind of relevance are we getting out of this evidence versus the prejudicial impact? And the argument is that whatever little relevance the government was able to glean from these videos was substantially outweighed by their prejudicial impact and should have never been introduced to the jury. Now, there was a limiting instruction? I believe the only limiting instruction was, yeah, the just standard limiting instruction. Based on the evidence. That's correct. Okay. Thank you. Thank you very much. As to the last point of Judge Randell, not only was there the judge's limited instruction, but both prosecutors in the original summation and in the rebuttal summation expressly told the jury there was nothing illegal about possessing videos. And the prosecutor in rebuttal said, what's relevant? It's not illegal to possess these videos, but what's relevant is these videos show what's going on inside the heads of the defendants. And they certainly did that. These videos. I'm struggling with that. Maybe you can talk about my initial remarks to Mr. Hoffman. It just seems to me there's an example of blatantly over trying the case. That doesn't mean that it's reversible. But with all the stuff the government had, why it had to put these things in evidence is beyond me. I'm not sure it shows anything. It may. You can argue it shows what's going on inside their head where they wouldn't be watching it. It may be rank curiosity. Heaven knows the kinds of stuff that comes on CNN and Fox and BBC and everything else. When these kinds of videos are released, people watch them out of curiosity. That doesn't mean that I have seen, for instance, probably in this courtroom, I've seen videos of people making statements while in detention either by a terrorist group or by somebody else or being held for ransom. It doesn't mean that I'm sitting there that I'm sympathizing with the capitalism. I'm sitting there. And I'm curious. Maybe it's different because I don't go out to the video store and rent these videos. But even then, it seems to me you could argue it's just curiosity. That's a jury argument. But the judge himself said that the probative value here is close, that it's minimal. And it seems to me it's minimal probative value, clearly cumulative. The court never on the record engaged in any kind of weighing that I can see of the probative value versus the prejudicial value. If it's there, I've got the appendix. Maybe you can direct me to it. But it just seems like it's problematic to me. Your Honor, I would like to direct you to it because Judge Kugler, there was briefing on this issue. There was extensive argument on this issue. And the judge then undertook, he quoted extensively, I'm sorry, he spoke at some length on the record as to the relevance of this information. And then he... Did he look at the beheading video? Correct, Your Honor. And then he spoke precisely about the 403 balancing. If you could just bear with me for a moment so I could find that. Is that the 809? No, Your Honor, the supplemental appendix I don't think has... Oh, you're right, you're right. That's right. There is a portion of the transcript that wasn't included in the appendix. It's still horrifying. Your Honor, he did. There was a lot of horrifying evidence in this case because of the nature of the crime. And perhaps... Are we talking just about the beheading videos and how they were handled or are we talking about all of the videos? There's no challenge, Your Honor. I'd like to, first of all, just emphasize these aren't beheading videos because the jury didn't see any beheading. These are redacted videos. And Judge Kugler didn't tell us, don't come in here with any beheading videos. We, when the defendants filed a motion asking that the beheading videos be kept out of evidence, we said, Judge, we're not offering to put the entire videos into evidence. We are going to take out the actual beheadings. What we wanted to show, and these videos, these redacted videos do it in a different way than any of our other evidence, is how the defendants trained themselves so that they could go in and commit cold-blooded murder against people who they perceived to be the enemies of Islam. They looked at... They've got videos with figures of Bush and government officials with bullets being representation of being shot in the head, not actually shooting the head off of it. You've got that. You've got these martial arts training films, which go on and on for like almost an hour, of these five guys doing martial arts techniques and training. You've got all that kind of stuff to show training. And then you've got, I don't know how many hours it was, how I've been loud and talking to them about what it takes to become a suicide mission jihadist and the kinds of weaknesses that will keep you from being chosen for that kind of a mission. Why, again, do you need this? One, I think it is cumulative, and if it is cumulative, it's not satisfactory to the four or three balance. How does that show any more than some of these other films, which seem more directly to go to the state of mind, and are not nearly this emotional? Well, Your Honor, the emotional stuff, I would submit, is the recordings, the audio recordings that came into evidence without objection, in which the defendants say, when I first saw this video, when I first saw Mr. Berg's head being cut off, I said, everybody shut up. But now we watch it with no problem. That, I think, was absolutely critical evidence to show that the defendants were watching these specific videos, these beheading videos, in order to train. They went to the Poconos with guns, and they shot at balloons the size of human heads to train. But they also had to train themselves so that when they weren't shooting at balloons, but when they were shooting at human beings, they wouldn't pause. They'd pull the trigger. How did they do that? They looked at videos of the people who they idolized, the Mujahideen in Iraq, who were so committed to their religion, and that fighting the enemies of their religion was so essential that you could carry out the kind of crimes that were carried out in those videos. You could take a defenseless person and, together with the sort of ritualistic activity that took place before the actual beheading, you could say, this kind of crime is not only encouraged by the way we interpret Islam. They trained themselves watching these videos over and over and over again. And because, as Mr. Huff said, because the key issue in this case is they didn't mean it. They talked about jihad, but they didn't mean it. Well, how do we know they meant it? Because they trained for it. They trained in the Poconos, and they trained in their own apartments by watching these videos. And to show what someone's intent is, to show that their intent is to actually go out and commit cold-blooded murder, we were entitled to not only show the jury not only what these defendants said, but what they chose to observe. Not only the outputs, but the inputs. These videos that they collected off the internet and obsessively watched was a key input to their training.